UNITED STATES DISTRICT COURT
EASTERN DIVISION OF MISSOURI
EASTERN DIVISION

WAYNE E. LINGENFELTER,          )
                                )
        Plaintiff,              )
                                )     No.  4:06CV00031 FRB
                                )
v.                              )
                                )
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,[1]  )
                                )
        Defendant.              )


## MEMORANDUM AND ORDER


        This matter is on appeal for review of an adverse ruling by the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural Background

        On September 17, 2003, Wayne E. Lingenfelter ("plaintiff") applied for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, alleging disability as of September 1, 2002 due to attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and the

_____

        [1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

-1-

condition of his right leg being shorter than the left, resulting in back, leg and hip pain. (Tr. 110-13.) Plaintiff's initial application was denied on January 6, 2004, and plaintiff filed a request for a hearing before an administrative law judge ("ALJ") on February 17, 2004. (Tr. 85-90.) On October 21, 2004, a hearing was held before an ALJ, during which plaintiff was represented by attorney Michael Ferry. (Tr. 27-54.) On May 25, 2005, the ALJ issued her decision denying plaintiff's application for benefits. (Tr. 10-26.)

On July 29, 2005, plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council. (Tr. 5.) With this request, plaintiff's attorney submitted a letter brief dated July 21, 2005. (Tr. 5, 336-40.) The Appeals Council denied plaintiff's request for review on November 4, 2005. (Tr. 2-4.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Testimony of Plaintiff</u>

The hearing consisted of testimony from plaintiff and from Ms. Kathryn Worzel, plaintiff's case worker. Under questioning from the ALJ, plaintiff testified that he was 44 years of age and had a valid driver's license. (Tr. 32, 35.) He has a GED, and completed one semester of community college. (Tr. 47.) Plaintiff lives in his brother's home, along with another brother

and his mother. (Tr. 33.) Plaintiff's brother Mike, who owns the home plaintiff lives in, works as a truck driver and pays all the bills. Id. Plaintiff receives food stamps, but has no other income. Id.

Plaintiff was uncertain whether he had worked up to September 1, 2002, the date of his alleged disability. Id. Plaintiff testified that he is not currently working in any field. (Tr. 42.) Regarding his work background, plaintiff testified that he has worked in the fields of carpentry, lighting maintenance, and siding, and that he last worked as a carpenter in 2000 to 2001, and half of 2002. (Tr. 34-35.) Plaintiff received unemployment benefits after being terminated from the lighting maintenance job he held preceding his last job. (Tr. 35.) Plaintiff received workers' compensation benefits in approximately 1984 while working for a siding company. (Tr. 40.) In addition, in approximately 1990, plaintiff worked for Arnold Muffler, an auto parts warehouse, where he worked both as a warehouse worker and a delivery person. (Tr. 47-48.)

Regarding his physical impairments, plaintiff testified that, due to a 1974 auto accident, his right leg is one and three-quarters inches too short. (Tr. 36.) Plaintiff further testified, "I have low back trouble and my legs, I have numbness and tingling and stuff and of my upper back and my neck and around my head."

<u>Id.</u>  Plaintiff further testified that he suffers from tinnitus,[2] which began while he was working in lighting maintenance. (Tr. 36-38.) Specifically, plaintiff was carrying a large box full of lamps, which exploded when he accidentally dropped the box, creating a very loud noise. (Tr. 36-37.) Plaintiff testified that he has seen a doctor on one occasion for this condition, and appeared to indicate that he has other visits scheduled. (Tr. 37.)

The ALJ then questioned plaintiff regarding his alleged mental impairments.  Plaintiff testified that he is bipolar, and suffers from severe depression. (Tr. 38.)  Plaintiff testified that his major troubles are confusion, delusions, and suicidal thoughts.  <u>Id.</u>  Plaintiff testified that he has trouble concentrating, and that, while working, he made many mistakes.  <u>Id.</u> Plaintiff has never attempted suicide, and has never been hospitalized for any mental impairment.  <u>Id.</u>  Plaintiff received counseling therapy at Crossroad Christian Counseling in 1998, and also received counseling arranged for him by the lighting maintenance company that once employed him. (Tr. 39.)

During the course of her questioning, the ALJ noted that plaintiff's medical records indicated drug and alcohol abuse, and further indicated prescription drug abuse. (Tr. 39.)  Plaintiff testified that he was unaware of any prescription drug abuse, and

---

[2]Tinnitus refers to a condition in which a person hears noise in his ears, such as ringing, buzzing, roaring, or clicking. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1438 (23rd ed. 1957).

further testified that he had never attended any rehabilitation program. Id. Plaintiff testified that he had not consumed alcohol for over two years, and had not used illegal drugs since 1987. Id.

Plaintiff testified that he is currently receiving medical treatment at the Murphy Clinic, and that he is being treated for a hypothyroid condition and high cholesterol. (Tr. 40-41.) Plaintiff is also receiving medication for depression and bipolar symptoms. (Tr. 41.) Plaintiff testified that he suffers from chronic pain "all over," and that he believes it is caused by an auto accident which occurred when he was 14 years old, and his history of working in heavy labor. (Tr. 41-42.) Using a one-to-ten scale, plaintiff rated his pain at six. (Tr. 42.) To manage his pain, plaintiff takes Tylenol-3[3] and Maxalt.[4] (Tr. 42-43.)

In 1997, plaintiff was jailed after "robbing a house," but spent only a "couple days" in custody because he had "immunity." (Tr. 43.) At the age of 19, plaintiff was ticketed for DWI, and was also arrested for failure to "pay a city sticker." (Tr. 43-44.) Plaintiff reported no arrests in connection with illegal drugs. (Tr. 43.) The ALJ noted that plaintiff had been arrested "five times," but plaintiff testified that some of those arrests occurred when he was a juvenile. Id.

---

[3]Tylenol 3 is a combination of codeine and acetaminophen and is indicated for use in the treatment of mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601005.html

[4]Maxalt is indicated for use in the treatment of migraine headaches. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203620.html

-5-

Plaintiff is divorced, and has a 21-year-old daughter from his marriage. (Tr. 46.) Plaintiff also has twin ten-year-old children with a girlfriend. Id. Plaintiff testified that he and the mother of the twins are attempting reconciliation, and that he currently has no other girlfriends. Id.

Regarding his daily activities, plaintiff testified that he rises at approximately 10:00 in the morning, and may do the dishes and watch television. (Tr. 44-45.) Plaintiff testified that he is able to do some yard work and laundry, and is able to vacuum and cook some things. (Tr. 45.) Plaintiff testified that he does not go to the movies, restaurants or bars, but that he does attend church. Id. Plaintiff also attends sporting events and other after-school events at his children's school. Id. Plaintiff testified that he last gambled in 2000. (Tr. 47.)

The ALJ then heard testimony from Ms. Worzel, a case worker with BJC Behavioral Health, an agency that provides psychiatric care and medications to adults without insurance or other means to furnish such services. (Tr. 51.) Ms. Worzel testified that she accompanies plaintiff to his doctor's appointments because the "chaos" at the clinic is too stressful for him, and further provides general, supportive counseling and encouragement to plaintiff. (Tr. 51-52.) Ms. Worzel understood plaintiff's diagnosis to include ADHD, depression, and perhaps some form of Axis II diagnosis which may include an antisocial personality disorder which causes him to isolate himself from

others out of fear that he is poorly regarded. (Tr. 51-52.) Ms.
Worzel indicated that she understood plaintiff's depression to be
related to multiple failures throughout his life, and his current
inability to provide financially for his children. Id. Regarding
plaintiff's social activities, Ms. Worzel testified that plaintiff
attended after-school activities with his children and that he was
active with a church group. (Tr. 53.)

Following the hearing, the record was left open, and
vocational expert ("VE") Michael P. Brethauer submitted answers to
interrogatories on January 20, 2005. (Tr. 10; 62-65; 118-121.)
Therein, he opined that plaintiff was unable to perform his past
relevant work, but was able to perform work that existed in
significant numbers in the regional economy of Missouri and in the
national economy. (Tr. 119-120.) Specifically, the VE indicated
that plaintiff retained the ability to perform the following jobs:

> 1. Glass-Cutting-Machine Feeder (D.O.T. #
> 677.686-014), with 5,200 jobs in the regional
> economy and 250,000 jobs in the national
> economy;
>
> 2. Production Assembler (D.O.T. # 706.687-
> 010) with 30,000 jobs in the regional economy
> and 1,500,000 jobs in the national economy;
>
> 3. Housekeeping Cleaner (D.O.T. # 323.687-
> 024) with 18,000 jobs in the regional economy
> and 900,000 jobs in the national economy; and
>
> 4. Laminating-Machine Offbearer (D.O.T. #
> 569.686-046), with 8,300 jobs in the regional
> economy and 630,000 jobs in the national
> economy.
>
> (Tr. 120.)

B.   <u>Medical Records</u>

Records from Dr. Scott J. Arbaugh, M.D., indicate that plaintiff was first seen on May 9, 1994, with complaints of depression, hopelessness and worthlessness.   (Tr. 312A-313.) Plaintiff stated that his first psychiatric treatment had occurred at the age of eight, when he was evaluated for symptoms of hyperactivity and insomnia.   (Tr. 312A.)   At that time, it was recommended that plaintiff be medicated, but his parents refused consent, and plaintiff had no other psychiatric treatment until the present time.   <u>Id.</u>   Plaintiff reported a history of chemical dependency, including alcohol, marijuana, intravenous cocaine, LSD, intravenous crystal methedrine and mescaline.   <u>Id.</u>   Plaintiff reported being sober since 1988. (Tr. 312A.) It is further noted that plaintiff had difficulty with gambling, and further that he exhibited extremely impulsive behavior.   (Tr. 313.)   Upon exam, Dr. Arbaugh noted that plaintiff was pleasant and cooperative and spoke normally, but that he appeared depressed and restricted.   <u>Id.</u> Plaintiff denied suicidal or homicidal ideation.   <u>Id.</u>   Plaintiff was fully oriented to person, place and time, and exhibited fair insight and judgment.   <u>Id.</u>   Dr. Arbaugh diagnosed major depressive disorder with panic attacks, possible dysthymic disorder, history of substance abuse, and possible antisocial personality disorder. (Tr. 313.)   Dr. Arbaugh prescribed Nortriptyline[5] and advised

_____

[5]Nortriptyline is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682620.html

plaintiff to follow-up in three weeks. Id. Plaintiff returned to Dr. Arbaugh on May 31, 1994, and reported an improvement in his mood, sleeping habits, and appetite. (Tr. 312.) Plaintiff stated that although his ability to concentrate was still low, it had improved. Id. Plaintiff was seen again on September 19, 1994, and reported that he was feeling a lot better. Id. Plaintiff did report occasional feelings of nervousness accompanied by weakness and numbness in his extremities, but denied feeling depressed. Id.

Dr. Arbaugh's September 27, 1994 office note indicates that plaintiff stopped taking his medicine, and further indicates that plaintiff was prescribed Prozac[6] on November 7, 1994. (Tr. 311.) Dr. Arbaugh's records include a note indicating that plaintiff failed to keep an appointment in November 1994. Id.

Five years later, on November 2, 1999, plaintiff returned to Dr. Arbaugh for evaluation of attention deficit disorder. (Tr. 308-10.) Plaintiff complained of depression, problems concentrating, anxiety attacks, and loss of interest in hobbies. (Tr. 308.) Plaintiff stated that he had taken Paxil[7] with good results. Id. Upon exam, Dr. Arbaugh found that plaintiff had a slightly depressed affect, but exhibited no thought disorder, psychotic symptoms, or suicidal or homicidal ideation. (Tr. 310.)

---

[6]Prozac is indicated for use in the treatment of depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[7]Paxil is indicated for use in the treatment of depression, panic disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

Dr. Arbaugh further noted that plaintiff was pleasant and cooperative, and exhibited average intellectual functioning with fair insight and judgment. Id. Dr. Arbaugh diagnosed plaintiff with recurrent major depressive disorder in partial remission, panic disorder, adult ADD, alcohol dependence, pathological gambling, and a history of polysubstance abuse. Id. Dr. Arbaugh recommended an increased Paxil dosage, and the addition of Wellbutrin[8] to manage plaintiff's ADD. Id. Dr. Arbaugh further recommended that plaintiff attend Alcoholics Anonymous ("AA") meetings, and remain sober. (Tr. 310.)

Plaintiff returned to Dr. Arbaugh on November 23, 1999 and reported that he had not begun AA as recommended, but had abstained from alcohol. (Tr. 307.) Plaintiff reported continued depression. Id. Dr. Arbaugh increased plaintiff's Paxil dosage. Id. On December 21, 1999, plaintiff reported feelings of depression, low energy, and an inability to concentrate. (Tr. 306.) He denied gambling or using alcohol. Id. Dr. Arbaugh discontinued Paxil, started plaintiff on Celexa,[9] and increased plaintiff's Wellbutrin dosage. Id. Dr. Arbaugh reiterated his recommendation that plaintiff attend either AA meetings or some other type of recovery class, and return in one month. Id.

---

[8]Wellbutrin is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[9]Celexa is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699001.html

Dr. Arbaugh's records indicate that plaintiff failed to keep his appointments on January 24, 2000 and February 2, 2000. (Tr. 305.) On February 4, 2000, plaintiff saw Dr. Arbaugh and reported that he had been terminated from his job on February 3, 2000, and that he had apparently initiated proceedings against that employer. Id. Plaintiff reported mood swings, but no trouble with his appetite or sleep. Id. Dr. Arbaugh recommended resuming Paxil. Id.

Records from BJC Behavioral Health ("BJC") indicate that plaintiff was treated there from June 27, 2000 through March 12, 2001. (Tr. 285-86.) Plaintiff reported being sporadically employed, and stated that he needed medication for depression and anxiety disorder. (Tr. 285.) The BJC records contain plaintiff's history of psychological treatment with Dr. Arbaugh in 1994, and indicate that he was only compliant with treatment for about six months. Id. It is further noted that plaintiff resumed treatment with Dr. Arbaugh in November of 1999 and was treated with Paxil, but stopped taking the medicine and attending treatment sessions in January 2000. Id. It was noted that plaintiff was seen by Dr. N. Rao Kosuri on June 27, 2000 and was prescribed Paxil, but that when he returned for follow-up on November 7, 2000, he had stopped taking his medications and had failed to follow up with Dr. Arbaugh as instructed. Id. Plaintiff was again prescribed Paxil and advised to follow up in four weeks, and was seen by Dr. Kosuri on December 5, 2000. (Tr. 285.) In February 2001, plaintiff advised

BJC that he had not been taking his medication, and no longer wanted to see a psychiatrist. Id. He reported that he had a new group of supportive friends, and that he had no symptoms and was able to live and function independently. Id.

The BJC records indicate that plaintiff resumed treatment there on January 2, 2002, at which time he was interviewed by intake specialist Anne Radetic-Murphy, M.S.W. (Tr. 261-67; 287-93.) Plaintiff reported mood swings and difficulty with keeping a job and getting along with his family, and stated that he wanted medication to control his thoughts and mood. (Tr. 261.) Plaintiff reported a history of alcohol and drug abuse, but stated that he last drank four beers two weeks ago, and had not used street drugs in years. Id. Plaintiff stated that he first drank at the age of six, began drinking regularly at the age of 10, and by age 14 was consuming a case of beer per week. (Tr. 263.) Plaintiff reported that, at his highest tolerance, he could drink a case and a half of beer per day, and that this type of use continued until age 28, at which time plaintiff began a pattern of heavy drinking followed by periods of abstinence. (Tr. 263-64.) Plaintiff reported having once lapsed into a coma from an overdose of alcohol. (Tr. 264.) Plaintiff further reported first smoking marijuana at the age of 10, at which time he smoked every day. Id. Plaintiff first used cocaine in 1987, and also reported having used meth, opium, acid, "black beauties," Valium, and Percodan, and that he had sniffed glue. Id.

Plaintiff reported that he enjoyed golf, camping, and boating, and further reported visiting the race track about once per month. (Tr. 266.) Plaintiff's history of treatment with Dr. Arbaugh is noted, and Ms. Murphy included a notation that plaintiff stopped going to Dr. Arbaugh due to lack of money. (Tr. 262.) Ms. Murphy further noted plaintiff's medical records revealed that he failed to consistently refill and take his prescribed medication, and that he stopped attending appointments with his psychiatrist. (Tr. 263.) Plaintiff reported that Paxil had helped his anxiety symptoms. (Tr. 266.)

Ms. Murphy noted that plaintiff was able to independently perform living skills such as cooking and shopping, and that he was knowledgeable about personal care and safety. (Tr. 264-66.) It is further noted that, although plaintiff seemed motivated for treatment, he was hesitant when it was recommended that he schedule an appointment with a vocational specialist. (Tr. 266.) Plaintiff was advised to begin counseling. (Tr. 267.)

The record indicates that plaintiff began treatment sessions with Dr. Wahba of Psych Care Consultants on March 29, 2002. (Tr. 301-303.) Plaintiff reported taking Wellbutrin, and complained of insomnia, mood swings, and trouble with social interaction and with keeping a job. (Tr. 301.) Plaintiff further reported a troubled childhood and an unstable family life. Id. Dr. Wahba noted that plaintiff was not suicidal. (Tr. 303.) Upon exam, Dr. Wahba noted that plaintiff had an appropriate affect, a

-13-

depressed mood, and intact thought processes. (Tr. 302.)
Plaintiff was diagnosed with ADD and possible bipolar disorder.
(Tr. 303.) Plaintiff's Wellbutrin dosage was increased, and he was
also prescribed Buspar[10] and Remeron.[11] Id. Plaintiff returned to
Dr. Wahba for follow up on April 26, 2002, and reported a
fluctuating energy level and ability to concentrate. (Tr. 300.)
Plaintiff advised that he had stopped taking Remeron and Buspar due
to bad reactions. Id. Plaintiff was continued on Wellbutrin and
was also prescribed Topamax.[12]

Plaintiff returned to Dr. Wahba on May 31, 2002, and
reported that he had discontinued all medications except for
Wellbutrin. (Tr. 299.) Plaintiff reported having no energy, and
further reported that his 46-year-old brother had passed away due
to a drug overdose. Id. Plaintiff reported having high energy
levels while using "speed," but did not specify when he had used
it. Id. Plaintiff was continued on Wellbutrin. Id. Plaintiff
was seen again on July 2, 2002, and reported that he was doing
better, with increased energy levels, an increased ability to
concentrate, and decreased anxiety. (Tr. 298.) Plaintiff reported

---

[10]Buspar is indicated for use in the treatment of anxiety disorders or
in the short-term treatment of symptoms of anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

[11]Remeron is indicated for use in the treatment of depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697009.html

[12]Topamax is indicated for use in the treatment of symptoms related to
epilepsy and other seizure disorders.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697012.html

he was living with his brother and "still looking for a job." Id. Plaintiff was advised to take Zoloft. Id. Plaintiff was seen again on August 13, 2002 and reported decreased moodiness, anxiety and depression. Id. Plaintiff reported an increase in his ability to concentrate, and stated that he was working part time and living with his brother. (Tr. 298.) Dr. Wahba noted that plaintiff was "generally improved," and recommended plaintiff continue Zoloft and Remeron. Id.

Plaintiff returned to Dr. Wahba on October 15, 2002 and reported mood swings. (Tr. 297.) Plaintiff was continued on Zoloft and Remeron. Id. Plaintiff was seen again on November 26, 2002 and reported decreased mood swings but persistent anxiety, which he attributed to the "time of year." (Tr. 296.) Plaintiff was continued on Zoloft and Remeron. Id. Blood tests were performed which apparently revealed high thyroid levels, and on December 10, 2002, Dr. Wahba's office telephoned plaintiff's case worker to advise of this and recommend that plaintiff follow up with his primary care physician. Id. Finally, on January 27, 2003, plaintiff saw Dr. Wahba and reported that he had seen his primary care physician regarding his thyroid condition, and further reported decreased energy. (Tr. 295.) It was noted that plaintiff's condition was better while on Paxil, and plaintiff's

medication was changed to Paxil and Depakote.[13]  Id.  It is further
noted that plaintiff had filed a disability claim.  Id.

The BJC records also include quarterly review reports
documenting plaintiff's psychological treatment.  The first such
report was completed on April 15, 2002 by Deborah L. Tannenbaum,
M.S.W., L.C.S.W., and indicates that plaintiff attended scheduled
appointments with Dr. Kosuri on January 8, 2002 and February 5,
2002, following which he saw Dr. Wahba on March 29, 2002.  (Tr.
255.)  It was noted that plaintiff was taking Remeron and
Wellbutrin, and that he had been diagnosed with recurrent major
depressive disorder.  Id.  It is noted that plaintiff reported
drinking three beers several times per week, and was advised that
doing so would lessen the effectiveness of his medications.  (Tr.
255-56.)  It is further indicated that plaintiff met with Ms. Anja
Bunton, a BJC employment specialist, who offered to help plaintiff
write a resume.  (Tr. 256.)

A second review report dated October, 2002 indicates that
plaintiff had continued to treat with Dr. Wahba for medication
management, and that his compliance was "good," yielding increased
concentration and decreased anxiety and depression.  (Tr. 257.)
Plaintiff advised that he felt "down" and was unable to get out of
bed three days each week, and that he drank alcohol on these days.

---

[13]Depakote is indicated for use in the treatment of bipolar disorder and
also for the prevention of migraine headaches.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html

<u>Id.</u>  Plaintiff was told this was related to his alcohol abuse, but plaintiff was not interested in alcohol rehabilitation treatment. <u>Id.</u>  It is further indicated that plaintiff had been putting off seeing a doctor for a physical examination, and this was again recommended.   <u>Id.</u>   It is further indicated that plaintiff was working part time doing carpentry work with a friend, and that he was active in after-school activities with his children.  (Tr. 257.)

A BJC review report dated February 12, 2003 indicates that plaintiff's current complaints were poor concentration, lack of energy and motivation, a thyroid condition and a potential peptic ulcer.  (Tr. 253-54.)  Plaintiff was noted to be taking Paxil and Depakote.  <u>Id.</u>  It is further noted that plaintiff was exhibiting personal responsibility by abstaining from alcohol, engaging in many activities with his children (attending school functions and sports events), attempting reconciliation with the mother of his children, and attending church.  <u>Id.</u>  Plaintiff was advised to continue treatment with Dr. Wahba and his primary care physician, become involved in some type of employment program, and join a divorced/single father's group.  (Tr. 253.)

BJC treatment records dated December 16, 2003 through March 12, 2004 indicate that plaintiff had some difficulty obtaining a prescription for Ritalin.[14]  (Tr. 251-52.)  On March 12,

_____

[14]Ritalin is indicated for use in the treatment of ADHD. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202361.html

2004, it is noted that he is still unable to work, is always tired, and lives with his brother. (Tr. 252.) It is noted that he spent his time driving his children around. Id.

Records from St. Louis County Department of Health, John C. Murphy Health Center ("Murphy Clinic") indicate that plaintiff was seen for routine care on December 18, 2002, January 28, 2003, and February 12, 2003, and was given prescriptions and medication. (Tr. 276-79.) On March 26, 2003, plaintiff was seen at the Murphy Clinic for a routine follow-up related to his thyroid condition, and he was noted to be suffering from a migraine headache. (Tr. 276.) Plaintiff was given Ibuprofen and advised to follow-up in six weeks. Id. Plaintiff was seen again on October 3, 2003 with complaints of swollen glands on the sides of his neck. (Tr. 274.) Plaintiff was diagnosed with tonsillitis, was given antibiotics, and advised to take Ibuprofen and return to the clinic in three months. Id.

The record indicates that, on September 18, 2003, plaintiff was seen by Dr. Kosuri with complaints of sadness, depression, crying spells, lack of energy and motivation, and no desire to get out of bed. (Tr. 283.) Dr. Kosuri found plaintiff to be alert and oriented upon exam. (Tr. 284.) Dr. Kosuri diagnosed plaintiff with recurrent major depressive disorder, and

prescribed Effexor.[15]

On December 23, 2003, plaintiff was examined by Dr. James
D. Reid, Ph.D. (Tr. 249-50; 268-71.)[16] Plaintiff reported being
unable to function due to his mental state, and specifically stated
that he lost every job he obtained due to his behavior. (Tr. 249.)
Plaintiff reported taking Seroquel,[17] Paxil and Levoxyl,[18] and denied
ever being hospitalized for any psychiatric condition. Id.
Plaintiff reported trouble with personal relationships. (Tr. 249-
50.) Plaintiff gave a history of working in siding installation,
labor and carpentry, and further reported that he was fired from
his carpentry position due to repeated mistakes. (Tr. 250.)

On the subject of plaintiff's drug and alcohol use, Dr.
Reid found plaintiff to be "[v]ery vague and impossible to pin
down." Id. Dr. Reid characterized plaintiff's mannerisms and eye
contact as "somewhat avoidant", and concluded that plaintiff was
not being completely forthcoming about his substance and alcohol
problems. (Tr. 250, 268.) Plaintiff reported suffering blackouts,

---

[15]Effexor is indicated for use in the treatment of depression and
generalized anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

[16]The transcript includes 17 pages of materials from BJC Behavioral
Health between pages two and three of Dr. Reid's report. See (Tr. 249-71.)
Dr. Reid's report is, however, included in its entirety.

[17]Seroquel is indicated for use in the treatment of bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

[18]Levoxyl is indicated for use in the treatment of hypothyroidism, a
condition in which the thyroid gland produces insufficient amounts of hormone.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682461.html

being told that he had a drinking problem, and having one DWI, but was unable to tell Dr. Reid when he last drank alcohol. (Tr. 250.) Plaintiff reported trying marijuana as a teenager and using cocaine following one of his divorces, but could not remember which divorce. Id. Plaintiff further reported that he may have used mescaline and LSD around the age of 16. Id. Plaintiff was unable to recall when he last gambled, but did note that he had been diagnosed with "pathological gambling" in 1999. (Tr. 268.) Plaintiff denied suicidal or homicidal ideation. (Tr. 269.) Plaintiff reported sleeping until noon or 2:00 p.m., taking his medication, watching television, and visiting his children. Id. Plaintiff reported that he had no friends, but that he generally got along well with others. Id. Plaintiff reported being able to care for his own personal needs, shop, cook using the microwave, and do his own laundry. Id.

Upon exam, Dr. Reid found plaintiff's contact with reality to be within normal limits, and found plaintiff's concentration, persistence and pace to be slightly to moderately impaired. (Tr. 269.) Dr. Reid diagnosed plaintiff with alcohol and poly-substance abuse (if not dependence); impulse control disorder (related to plaintiff's gambling), major depression which was recurrent and moderate, attention-deficit/hyperactivity disorder, and personality disorder. (Tr. 269-70.) Dr. Reid opined that plaintiff's had poor motivation, and recommended that plaintiff enter a sobriety program and perhaps begin psychotherapy.

(Tr. 270.)

Dr. Reid opined that plaintiff was "slightly impaired" in his ability to socially interact, relate to others, and to understand, remember and follow instructions. Id. Dr. Reid found plaintiff was "moderately impaired" in his ability to maintain attention required to perform simple tasks, withstand the stresses and pressures of an average work day, and to adapt. Id.

On January 2, 2004, Dr. Robert Rocco Cottone, Ph.D., completed a mental residual functional capacity assessment. (Tr. 135-53.) Dr. Cottone found plaintiff was "markedly limited" only in his ability understand, remember, and carry out detailed instructions, and interact appropriately with the general public. (Tr. 135-36.) Dr. Cottone concluded that plaintiff must avoid work involving intense or extensive interpersonal interaction, close coordination or communication with other workers or supervisors, proximity to controlled substances, and contact with the public. (Tr. 137.) Dr. Cottone further concluded that plaintiff was able to understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers and supervisors, and adjust adequately to ordinary changes in work routine and setting. Id. Dr. Cottone found that plaintiff's credibility was "questionable," and that he gave "vague" responses when questioned regarding substance use. (Tr. 152-53.)

On February 27, 2004, Dr. Michele Van Eerdewegh, M.D., completed a mental Medical Source Statement ("MSS"). (Tr. 216-

219.) Dr. Van Eerdewegh checked boxes indicating that plaintiff had "extreme" functional limitation in his ability to cope with normal work stress, accept instructions and respond to criticism, understand and remember simple instructions, maintain regular attendance and be punctual, complete a normal workday/workweek, maintain attention and concentration for extended periods, sustain an ordinary routine, and respond to changes in a work setting. (Tr. 216-17.) Dr. Van Eerdewegh also checked a box indicating that plaintiff had suffered four or more episodes of decompensation in the past year. (Tr. 218.) Dr. Van Eerdewegh diagnosed plaintiff with major depressive disorder; ADD/adult type; PTSD chronic; and past history of alcohol abuse. (Tr. 219.) Dr. Van Eerdewegh assigned plaintiff a GAF of 50, and further indicated that plaintiff had a 60 GAF during the preceding year. Id.

BJC treatment records indicate that plaintiff was seen on August 6, 2004 by Dr. Eileen Wu-Evans. (Tr. 248.) Plaintiff indicated that he felt Paxil had helped with his anxiety, but that Zoloft made him nervous. Id. Dr. Wu-Evans noted that plaintiff had been prescribed Ritalin, but that he had not filled that prescription. Id. Upon exam, Dr. Wu-Evans noted plaintiff was cooperative and pleasant. Id. Dr. Wu-Evans discontinued plaintiff's Zoloft prescription and re-started him on Paxil, and further prescribed Trazadone and Ritalin. (Tr. 248.) The records of Dr. Wu-Evans further contain two "event notes" documenting contact with plaintiff's case manager indicating that plaintiff's

-22-

Ritalin prescription needed to be changed to Ritalin LA due to cost concerns. (Tr. 248A.)

Records from St. Mary's Health Center indicate that plaintiff was seen in the emergency room on September 1, 2004 following an automobile accident which occurred on that same date. (Tr. 221-33.) Plaintiff complained of back and neck pain, and further complained of tingling in the fingers of both hands. (Tr. 221, 231.) Plaintiff complained of no numbness or weakness, chest pain or shortness of breath, or abdominal pain. (Tr. 231.) It was noted plaintiff was taking Ritalin, Paxil, Levoxyl and Tramadol,[19] and that his past medical history was noted as remarkable for hypothyroidism and ADD. Id. It was noted that he did not drink alcohol. Id. Upon exam, plaintiff was noted to be in mild discomfort, but to be appropriately oriented and alert. Id. He had minimal tenderness in his neck and minimal pain with range of motion, and also had mild tenderness in his mid-thoracic area. (Tr. 232.) Cervical and thoracic spine x-rays revealed only small spurs and mild scoliosis. (Tr. 233.)

Records of Dr. Kimberly Ciaramitaro, D.C., indicate that plaintiff was seen on September 10, 2004, for treatment related to his September 1, 2004 automobile accident. (Tr. 240-47.) Plaintiff complained of migraine headaches, and pain in his legs, arms, and lower back. (Tr. 240.) Plaintiff further complained of

---

[19]Tramadol is used to treat moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

a "pinched nerve" in his neck, blurred vision, apparent discomfort in his wrist, and numbness and tingling. Id. On a case history form, plaintiff indicated that he suffered from "constant" nervousness and depression, noises in his ears, and near sightedness. (Tr. 241.) Plaintiff further indicated that he had suffered from alcoholism in the past. Id. Plaintiff was apparently advised to use ice to manage his symptoms. (Tr. 242.) Plaintiff returned to Dr. Ciaramitaro on September 14, 2004 and again on September 17, 2004 with complaints of continued headache and pain "everywhere," including his neck and low back, and a twitching, numb sensation in his left arm. Id. On both occasions, the records indicate plaintiff was treated with ice. Id. On September 22, 2004, plaintiff failed to appear for his appointment. Id. Plaintiff saw Dr. Ciaramitaro on three additional occasions, although the exact dates are unclear. See (Tr. 243.) On these occasions, plaintiff complained of neck pain, headaches, and twitching/numbness in his left arm. (Tr. 243.) He was advised to take Motrin for pain, and to continue to use ice. Id.

Records from the Murphy Clinic indicate that plaintiff was seen by Dr. Jamal Makhoul, M.D., on September 29, 2004. (Tr. 205-07.) It is noted that plaintiff had last presented to the clinic one year ago, at which time he had complaints related to hypothyroidism. (Tr. 205.) The records further indicate that although plaintiff had been prescribed Levoxyl, he had not filled the prescription until three weeks ago after being told by a

physician at BJC that his "blood levels were off." Id.  Plaintiff demanded that a blood test be performed and the results faxed to BJC psychiatry clinic.  Id.  Plaintiff further complained of back pain and tinnitus, and the records further indicate "non-specific" complaints of vision and hearing, recurrent ear infections, leg and abdominal pain, peptic ulcer, high cholesterol, joint, back and muscle pain, and psychiatric complaints, some of which occurred over 20 years ago.  Id.

Upon exam, plaintiff mental status was noted as "alert." (Tr. 206.)  Plaintiff's physical exam was normal, and he was noted to ambulate with a normal gait.  Id.  Plaintiff was diagnosed with acquired hypothyroidism, manic-depressive psychosis, attention deficit disorder of childhood with hyperactivity, and unspecified backache.  (Tr. 206-07.)  Plaintiff was prescribed Trazodone, Paxil and Ritalin, and was referred to Dr. William Feldner, D.O., a physician at the Murphy Clinic.  Id.  It is noted that plaintiff refused to take Ibuprofen for his back pain and demanded Celebrex instead, but that Celebrex could not be provided because it was not covered.  (Tr. 207.)

Plaintiff saw Dr. Ingrid Taylor, M.D., at the Murphy Clinic on October 6, 2004 with complaints of neck pain, migraine headache, and tinnitus.  (Tr. 199.)  Plaintiff indicated that he wanted Celebrex, stated that the Tylenol #3 his mother gave him was not helping, and further refused to take Ibuprofen.  Id. Plaintiff's mental status was noted as "alert," and his physical

exam was normal.  Id.  He was noted to have a normal gait and coordination.  Id.  Plaintiff was given Maxalt, and instructed to follow-up with Dr. Feldner.  (Tr. 200.)

On October 8, 2004, Dr. Eileen Wu-Evans, M.D., completed a MMS in which she indicated that she had been treating plaintiff since June of 2004.  (Tr. 235-38.)  Dr. Wu-Evans checked boxes indicating many areas of "marked" impairment related to plaintiff's activities of daily living; however, she only checked one box indicating "extreme" impairment relative to plaintiff's ability to respond to changes in a work setting.  (Tr. 235-36.)  Dr. Wu-Evans checked a box indicating that plaintiff had experienced three episodes of decompensation over the past year, and further indicated plaintiff's diagnosis as major depression with recurrent ADD, and past history of substance abuse.  (Tr. 238.)  Dr. Wu-Evans assigned a recent GAF of 50, and indicated plaintiff's highest GAF during the preceding year was 60.  Id.

Plaintiff returned to the Murphy Clinic on October 13, 2004 for an oral exam, and apparently received dental x-rays.  (Tr. 198.) No other complaints are noted.  See Id.  On October 14, 2004, plaintiff saw Dr. Feldner at the Murphy Clinic, and complained of back and neck pain.  (Tr. 196.)  Plaintiff was noted to be limping, and to have a decreased range of motion, and x-rays were ordered. Id.  X-rays of plaintiff's lumbar spine were performed at Midwest Radiological Associates on October 14, 2004, and revealed early degenerative changes of the bodies of L4 and L5, but were otherwise

-26-

normal.  (Tr. 201.)

Records from the St. Louis ConnectCare clinic indicate that plaintiff was seen on November 8, 2004 with complaints of tinnitus without ear pain for the past six years.  (Tr. 190.) Plaintiff stated that the tinnitus began after several fluorescent bulbs exploded inside a box he had been carrying.  Id.  Plaintiff further complained of "very occasional" dizziness and neck pain since an MVA.  Id.  It was noted plaintiff was taking Maxalt, Ibuprofen, Synthroid,[20] Paxil, Trazadone, and Ritalin.  Id. Plaintiff was diagnosed with bilateral tinnitus, and hearing tests were ordered.  (Tr. 190.)  Audiology testing was performed in the Otolaryngology Department of Washington University School of Medicine on  on December 16, 2004.  (Tr. 191-92.)  Plaintiff's speech and word recognition, and his tympanometry findings, were found to be within normal limits.  (Tr. 192.)

On December 27, 2004, plaintiff visited St. Louis ConnectCare for follow-up treatment related to bilateral tinnitus, and further complained of symmetrical hearing loss.  (Tr. 189.)  It is noted that there had been no progression in plaintiff's condition since his last appointment, and "conservative measures" were recommended to manage his symptoms.  Id.

III.     The ALJ's Findings

_____

[20]Synthroid is indicated for use in the treatment of hypothyroidism, a condition in which the thyroid gland produces insufficient hormone. http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202566.html

The ALJ found that plaintiff met the nondisability requirements set forth in Section 216(i) of the Social Security Act and was insured for his claim to Disability Insurance Benefits only through September 30, 2004 and that, as such, plaintiff's disability must be established on or before this date to establish plaintiff's entitlement to Disability Insurance Benefits. (Tr. 11.) The ALJ then applied the five-step sequential analysis and concluded that plaintiff was not entitled to Disability Insurance Benefits or Supplemental Security Income payments under Sections 216(i), 223, 1602 and 1614(a)(3)(A) respectively of the Social Security Act. (Tr. 12.)

The ALJ found that the evidence of record established that plaintiff had the medically determinable impairments of adult attention deficit disorder by history, affective disorder (Bipolar Disorder NOS/Depression), a history of alcohol and drug abuse, and a pathological gambling disorder reflecting impaired impulse control. (Tr. 15.) Regarding plaintiff's allegation of disability based upon the condition in his right leg that resulted from the 1974 auto accident, the ALJ noted that plaintiff was able to perform work involving significant exertion with this impairment, and further noted that when plaintiff wore a lift in his right shoe, he suffered minimal exertional limitations. The ALJ found that plaintiff had "severe" mental impairments, but that none were of listing-level severity. (Tr. 17.)

The ALJ found that plaintiff was unable to perform his

past relevant work, but that he retained the residual functional capacity ("RFC") to perform medium work.[21] (Tr. 22, 25.) The ALJ further found that plaintiff was limited to simple, unskilled work involving one and two-step instructions, but found that plaintiff could make simple work-related decisions, handle occasional changes in his work environment, and respond appropriately to supervisors and co-workers. (Tr. 22.) The ALJ found that plaintiff should avoid any contact with the public. Id. Using the VE's answers to interrogatories, the ALJ found that there existed a significant number of jobs in the national economy that plaintiff could perform, as noted, supra. Id. Consequently, the ALJ found that plaintiff was not under a "disability" as defined in the Social Security Act at any time through the date of the decision, citing 20 C.F.R. § 404.1520(g) and 416.920(g). Id.

**IV. Discussion**

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical

---

[21]The ALJ noted the following definition of medium work: Work that requires a maximum lifting of 50 pounds and the frequent lifting of 25 pounds; standing/walking for six hours in an eight-hour work day; and occasional bending, balancing, and climbing (stairs and ramps only, not ladders), and stooping, kneeling, crawling, bending and crouching movements. (Tr. 21-22; 24.)

or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to persons who are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled.

The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and
      consulting physicians;

4.    The plaintiff's subjective complaints
      relating to exertional and non-exertional
      activities and impairments;

5.    Any corroboration by third parties of the
      plaintiff's impairments;

6.    The testimony of vocational experts, when
      required, which is based upon a proper
      hypothetical question which sets forth
      the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).


The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff argues that the ALJ erroneously discredited the opinions of treating psychiatrists Drs. Van Eerdewegh and Wu-Evans, expressed in their MSS forms dated February 27, 2004 and October 8, 2004, respectively. Plaintiff asserts that such failure resulted in an improper assessment of plaintiff's RFC, in that plaintiff's limitations were not

-32-

incorporated into the RFC determination.  Plaintiff further argues
that the ALJ failed to include, in both the hypothetical posed to
the VE and in the ultimate RFC assessment, some of the functional
limitations observed by Dr. Cottone in his January 2, 2004 report.
Plaintiff finally argues that the ALJ erred by failing to submit
his proposed interrogatories, containing the limitations noted by
Drs. Van Eerdewegh and Wu-Evans, to the VE.  In response, defendant
argues that the ALJ properly evaluated all of the medical evidence
of record, and that her decision not to give controlling weight to
the opinions of Drs. Van Eerdewegh and Wu-Evans was supported by
good reasons and substantial evidence.  Defendant asserts that the
ALJ's decision was based upon substantial evidence on the record as
a whole.

A.  RFC Determination

As set forth, supra, the ALJ in this matter determined
that plaintiff could not perform his past relevant work, but
retained the residual functional capacity to perform medium work.

Residual functional capacity is what a claimant can do
despite his limitations.  20 C.F.R. § 404.1545, Lauer v. Apfel, 245
F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's
RFC based upon all relevant, credible evidence in the record,
including medical records, the observations of treating physicians
and others, and the claimant's own description of his symptoms and
limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.
1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20

-33-

C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

The undersigned turns first to plaintiff's contention that the ALJ failed to undertake the proper analysis before discrediting the opinions of treating psychiatrists Drs. Van Eerdewegh and Wu-Evans. As described fully, supra, both BJC psychiatrists described plaintiff as having marked levels of limitation in his activities of daily living, a marked level of limitation in social functioning, and marked to extreme levels of limitation in concentration, persistence or pace. See (Tr. 216-19; 235-38.)

Ordinarily, a treating physician's opinion is entitled to substantial weight. Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000).

-34-

A treating physician's opinion will be granted controlling weight, provided it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. <u>Singh</u>, 222 F.3d at 452, <u>citing</u> <u>Kelly v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998.) This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
>
> 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to afford the opinion. <u>See</u> 20 C.F.R. § 404.1527(d). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating source provides support for his findings, whether other evidence in the record is consistent with the findings, and the treating source's area of specialty. <u>Id.</u> The Regulations further provide that the Commissioner "will always give good reasons . . . for the weight [given to the] treating source's opinion." <u>Id.</u> An ALJ is entitled

to discredit the opinion of a treating physician when it merely consists of vague and conclusory statements. <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001).

In this case, after evaluating the record as a whole, the ALJ found that the opinions Drs. Van Eerdewegh and Wu-Evans consisted of nothing more than vague, conclusory statements, and noted that the opinions were inconsistent with both the BJC treatment records and with the other medical evidence of record. (Tr. 21.) The ALJ noted that, although both doctors checked boxes describing extreme psychological symptoms precluding normal activities of daily living, the other evidence of record, including plaintiff's own testimony and the BJC treatment records themselves, documented that plaintiff was consistently independent in his activities of daily living. (Tr. 21.) The ALJ further noted that the BJC treatment records indicated that, although the record documented that plaintiff's impairments responded to medication, plaintiff was habitually non-compliant with taking his medicine and remaining in counseling. <u>Id.</u>; <u>See</u> <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (impairments controllable or amenable to treatment do not support a finding of disability).

Regarding the psychiatrists' opinions that plaintiff had suffered multiple episodes of decompensation over the past year, the ALJ noted that this opinion was not entitled to controlling weight because the record was void of evidence that plaintiff had visited the emergency room, scheduled an appointment to see a

psychiatrist, or been hospitalized due to any episode of decompensation. <u>Id.</u> In so stating, the ALJ was not, as plaintiff submits, imposing additional requirements not contemplated by the regulations to establish an episode of decompensation. The ALJ was simply noting the lack of evidence in the record as a whole supporting the opinion offered by the treating physicians, a finding expressly permitted by the regulations. <u>See</u> 20 C.F.R. § 404.1527(d).

As an additional matter, the undersigned notes that the opinions in question are in checklist form, and contain no information concerning the clinical or diagnostic techniques used to reach the conclusions stated therein. Such a document cannot give the "detailed longitudinal picture" of plaintiff's medical impairments contemplated by the regulations that would support a decision to give controlling weight to the opinion in question. <u>See</u> 20 C.F.R. § 404.1527(d)(2). The Eighth Circuit has held that a treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if they are without explanation or support, or are contradicted by other objective medical evidence in the record. <u>See</u> <u>Reed v. Barnhart</u>, 399 F.3d 917, 920-21 (8th Cir. 2005); <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071 (8th Cir. 2004); <u>Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001). The undersigned therefore finds that the ALJ's decision to discredit the opinions of Drs. Van Eerdewegh and Wu-Evans was supported by substantial evidence and good reasons. <u>See</u> 20 C.F.R. § 404.1527(d).

Plaintiff next argues that the ALJ improperly omitted, from both the hypothetical she posed to the VE and from her ultimate RFC assessment, certain functional limitations itemized in the January 2, 2004 report of non-examining state psychologist Rocco Cottone, Ph.D., and further improperly omitted the limitations observed by Drs. Van Eerdewegh and Wu-Evans.

"Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." Taylor v. Chater, 118 F.3d 1274, 1278 - 79 (8th Cir. 1997) (citing Porch v. Chater, 115 F.3d 567, 572-73 (8th Cir. 1997) and Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996)). The sufficiency of a hypothetical depends upon whether it encompasses all of the impairments that are substantially supported by the record as a whole. Taylor, 118 F.3d at 1279 (citing Porch, 115 F.3d at 572-73). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch, 201 F.3d 1010, 1015 (8th Cir. 2000)). "[T]he ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).

Dr. Cottone, in his January 2, 2004 report, concluded that plaintiff retained the ability to understand, remember, carry

-38-

out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers and supervisors, and adjust adequately to ordinary changes in work routine and setting. (Tr. 137.) The ALJ's hypothetical captured each one of these elements. Specifically, the relevant portion of the ALJ's hypothetical read as follows:

> "Because of the claimant's mental impairment, he is limited to simple unskilled work involving 1-2 step instructions. However, the claimant can make simple work related decisions, handle occasional changes in the work environment, and respond appropriately to supervisors and co-workers. The claimant should avoid contact with the public." (Tr. 119 at paragraph 10.)[22]

The "moderate" functional limitations observed by Dr. Cottone and, according to plaintiff, improperly omitted related to plaintiff's ability to maintain concentration and attention for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to be aware of normal hazards and take appropriate

---

[22]In question number 12 of the interrogatories, following the ALJ's hypothetical, the VE is asked to opine whether the individual described could perform any jobs that exist in significant numbers in the regional and national economy. (Tr. 119-120.) In response, the VE underlined "No." (Tr. 120.) However, throughout the remainder of the interrogatories, the VE gave very detailed answers concerning the types of jobs plaintiff could hold, and defined "regional economy" as the state of Missouri, as if his answer to question 12 had been "Yes." Id. It therefore appears that the VE's underlining of "No" in response to question 12 was merely a typographical error. Plaintiff concedes this point in his Brief in Support of the Complaint at page 22. See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.)

precautions, and to set realistic goals or make plans independently of others.  (Tr. 135-36.)

  The ALJ's failure to specifically itemize all of these limitations in her hypothetical was not error.  The hypothetical included all of the elements of Dr. Cottone's ultimate conclusion which, logically, encompassed each of the foregoing limitations as Dr. Cottone perceived them.  It can therefore be concluded that the hypothetical posed to the vocational expert was based on a hypothetical question that "captured the concrete consequences" of plaintiff's deficiencies which were supported by the record, and that the ALJ did not "ignore" any of the functional limitations observed by Dr. Cottone.  See  Taylor, 118 F.3d at 1278-79.

  Plaintiff finally submits that the ALJ erred when she failed to include the functional limitations observed by Drs. Van Eerdewegh and Wu-Evans, and further erred by failing to submit to the VE plaintiff's proposed interrogatories containing those opinions.  The undersigned finds no such error.  As discussed in detail, supra, the ALJ properly discredited the opinions of Drs. Van Eerdewegh and Wu-Evans after conducting the proper analysis, and the undersigned has found that decision to be based upon substantial evidence and good reasons.  The ALJ was therefore under no obligation to include those physicians' opinions in the hypothetical posed to the VE.  See Long, 108 F.3d at 187 ("[T]he ALJ may exclude from the hypothetical any alleged impairments that [he] has properly rejected as untrue or unsubstantiated.")

Plaintiff next argues that the ALJ's determination of his RFC is not supported by the medical evidence. However, a review of the ALJ's decision, including a review of her analysis of plaintiff's subjective complaints, reveals that her determination of plaintiff's RFC was based upon substantial evidence on the record as a whole.

Regarding plaintiff's allegations of physical disability, the ALJ noted that such impairments had been present for many years and had not precluded work involving heavy exertion, and further noted that plaintiff had worked on and off during the period he alleged he was disabled. (Tr. 18.) A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

Regarding plaintiff's diagnosis of adult attention deficit disorder, the ALJ noted that the record was void of evidence specifying either the testing methods used or the basis for such a diagnosis, other than plaintiff's own self-reported symptoms. (Tr. 17.) A medical opinion is not conclusive in determining disability status, and may be discounted if it is not supported by medically acceptable clinical or diagnostic data. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989). The ALJ further noted that the record did not indicate that plaintiff made frequent errors when he attempted tasks, or that it took him

additional time to complete tasks.  Id.

As will be discussed in greater detail, infra, the ALJ also noted that any limitations in plaintiff's daily activities were "less than marked," and contradicted a finding of disability. (Tr. 17.)  The Eighth Circuit has held that, where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not disabling.  See Gavin v. Heckler, 811 F.2d 1195, 1198 (8th Cir. 1987); See also 20 C.F.R. § 404.1520a and 416.920a.

The ALJ also noted that the record showed that, although plaintiff's symptoms responded to medication, he was repeatedly non-compliant with taking his medications.  (Tr. 17.)  If an impairment can be controlled with treatment or medication, it cannot be considered disabling.  Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)(quoting Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993)).  In addition, "[F]ailure to follow a prescribed course of remedial treatment without good reason is ground for denying an application for benefits."  Id.; see also 20 C.F.R. § 416.930(b).

Plaintiff submits that the ALJ failed to consider the impact of his inability to afford medicine.  However, the record documents that plaintiff sought and received medical and psychiatric treatment and medications on demand, remained compliant for a brief period, and then ceased both treatment and medication of his own accord.  One example of this is found in the BJC

discharge summary dated March 12, 2001, indicating that plaintiff's psychiatric treatment had been terminated at his request. (Tr. 285.) The summary indicates that plaintiff had informed his BJC psychiatrist that he no longer wanted to see a psychiatrist or take medication because he had found a new group of supportive friends, and was able to function independently. (Tr. 285.) As the ALJ properly noted, this calls into question the concerns regarding plaintiff's alleged inability to afford medication, when he failed to take medication as prescribed when it was available. See (Tr. 19.) In addition, the undersigned notes plaintiff's testimony that he was taking so many medications that he could not be certain whether he suffered side effects. (Tr. 42-43.) This is inconsistent with an allegation of inability to afford medication.

In evaluating plaintiff's subjective complaints, the ALJ cited Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and all of the relevant factors therefrom, and further cited the regulations corresponding with Polaski and credibility determination. (Tr. 18.) The ALJ noted that the record reflected several instances in which plaintiff's physicians observed him to be less than forthcoming regarding his drug and alcohol abuse, and further questioned his credibility generally. (Tr. 18-19.) This is evident in the records of Dr. Reid, who repeatedly stated that he found plaintiff to be "avoidant" and "impossible to pin down." See (Tr. 250, 268.) The ALJ concluded that this apparent dishonesty may have resulted in improper conclusions regarding

plaintiff's symptoms and treatment options.  See  Fitzsimmon v.
Mathews, 647 F.2d 862, 864 (8th Cir. 1981) (upholding an ALJ's
consideration of a claimant's lack of candor in evaluating his
subjective complaints).

The ALJ also noted that the record repeatedly documented
instances in which plaintiff ceased psychiatric treatment and/or
medication against medical advice.  It is proper for an ALJ to
discredit subjective complaints of disabling symptoms because of a
claimant's failure to follow through with recommended treatment.
Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001).

Regarding plaintiff's daily activities, the ALJ found
that plaintiff was able to perform "a wide range of daily
activities that demonstrated a high level of adaptive functioning."
(Tr. 19.)  Daily activities the ALJ noted were plaintiff's ability
to clean, shop, and cook, take public transportation and travel to
unfamiliar places, pay his bills, use a telephone and directories,
attend to his own hygiene and grooming, regularly attend his
children's after-school activities and sporting events, and
maintain an active involvement in a church group.  (Tr. 16.)  The
ALJ concluded that plaintiff had demonstrated that he was capable
of initiating and participating in these activities without
supervision or direction.  Id.  In the Eighth Circuit, daily
activities such as those noted by the ALJ in this case have been
upheld as weighing against a finding of disability.  See Lawrence
v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (attending to one's

own personal needs, and performing housework, cooking and shopping); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (grocery shopping and child care); Nguyen v. Chater, 75 F.3d 429 (8th Cir. 1996) (visiting neighbors, cooking own meals, doing one's own laundry and attending church); Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (carrying grocery bags, carrying out garbage); Shannon v. Chater, 54 F.3d 484, 487 (8th Cir. 1995) (cooking, cleaning house and performing other chores with help, visiting friends and relatives, attending church twice per month); Woolf, 3 F.3d at 1213 (living alone, shopping for groceries, doing housework with help).

        The ALJ further noted that, although plaintiff claimed he lacked the ability to function socially, the record documented no history of altercations or evictions. (Tr. 16.) The ALJ noted that plaintiff's self-reported dislike of being around strangers was not substantiated by credible third-party observations. Id. The ALJ noted that, although plaintiff reported avoiding interpersonal relationships, he had a long-term girlfriend with whom he had fathered two children. (Tr. 16, 19.) The ALJ further noted that the record established that plaintiff had social contacts with a group of friends from church and with his family, and that plaintiff appeared able to initiate social contacts with other people and communicate effectively with others. (Tr. 16.) In addition, the undersigned notes that, on December 23, 2003, plaintiff reported to Dr. Reid that he generally got along well

with others.  (Tr. 269.)

    The ALJ also noted that, during the hearing, plaintiff displayed no difficulty interacting with his representative and others in the hearing room, and that plaintiff displayed appropriate social behavior throughout the course of the hearing. (Tr. 19.)  The ALJ concluded that plaintiff's ability to routinely function to this extent supported the conclusion that his social functioning was only mildly impaired, and did not preclude a significant range of work activity. Similarly, the ALJ noted that, despite plaintiff's allegations that he was unable to maintain concentration, persistence and pace due to disabling attention deficit disorder, plaintiff was able to provide a detailed medical history when he testified, including dates, physicians' names, and the names of his prescriptions.  (Tr. 20.)  The ALJ noted that plaintiff's concentration was sufficient to follow the proceedings of the hearing with no apparent difficulties.  Id.; See Johnson, 240 F.3d at 1147-48 (ALJ is entitled to consider her personal observations of a claimant's demeanor in making credibility determinations).

    A review of the ALJ's determination of plaintiff's RFC reveals that she properly exercised her discretion and acted within her statutory authority in evaluating the evidence on the record as a whole.   The ALJ based her decision on all of the relevant, credible evidence of record, including the medical opinion evidence, and further properly discredited the opinions of Drs. Van

Eerdewegh and Wu-Evans after conducting the proper analysis. For the foregoing reasons, the undersigned finds that the ALJ's determination of plaintiff's residual functional capacity was based upon substantial evidence on the record as a whole. See 20 C.F.R. § 404.1520a; see also Jones v. Callahan, 122 F.3d 1148 (8th Cir. 1997) (substantial evidence supported ALJ's determination that claimant's psychological impairments were not of listing-level severity when the evidence failed to establish that the claimant's daily activities were restricted due to emotional causes, that there was significant deficit in his ability to function socially, or that claimant was undergoing any regular treatment by mental health professional or regularly taking medication for emotional symptoms.)

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F.2d at 821. Accordingly, the decision of the Commissioner in denying plaintiff's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is hereby affirmed and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of March, 2007.